## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| DONNA MAX, Derivatively on Behalf of PLUG POWER, INC. | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 1:22-cv- |
| ANDREW MARSH, PAUL B. MIDDLETON, MAUREEN O. HELMER, GREGORY L. KENAUSIS, GEORGE C. MCNAMEE, HOHANNES MINHO ROTH, LUCAS P. SCHNEIDER, JONATHAN SILVER and GARY K. WILLIS, | ) ) **DEMAND FOR JURY TRIAL** ) ) ) **REDACTED** PUBLIC VERSION ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| PLUG POWER INC., | ) ) |
| Nominal Defendant. | ) ) ) |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Donna Max ("Plaintiff") by her attorneys hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") against Defendants named herein. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This Complaint is also based on the investigation of Plaintiff's counsel, which included a review of, among other things, the books and records provided by Nominal Defendant Plug Power, Inc. ("Plug Power" or the "Company") pursuant to Delaware General Corporation Law Code § 220, public filings with the U.S. Securities and Exchange Commission ("SEC"), news reports, press releases, related

1

litigation and other public sources.

## SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought for the benefit of Plug Power against Defendants (defined below) for breaches of their fiduciary duties owed to the Company.

2.      Plug Power touts itself as a pioneering fuel cell company.   According to its SEC filings, the Company has not achieved operating profitability in any quarter since its formation approximately twenty-five years ago. As of December 31, 2021, the Company had an accumulated deficit of $2.4 billion.

3.      Defendants made, or caused the Company to make, materially false and misleading statements concerning Plug Power's business, operations, and prospects to make the Company's business appeal scalable.  Defendants also issued positive financial information and optimistic guidance, and continued to make assurances that the Company's internal controls were effective.

4.      The reality was that Defendants had been falsifying Plug Power's financial statements for years and the financial statements were riddled with errors that served not only to mask the Company's faltering performance based on a failed business model.   Additionally, the Company's internal controls were plagued with material deficiencies rendering them ineffective.

5.      The Individual Defendants were motivated to continue to falsely tout the Company's prospects and hide the Company's imminent restatements. These misrepresentations artificially inflated the  Company's stock, during which Defendants benefitted from lucrative insider sales for collective proceeds in excess  of $39.5 million and allowed them to exercise stock options several years early to take advantage of the Company's inflated share price.  Furthermore, the artificially inflated stock prices allowed Plug Power to sell millions of shares at inflated prices to

investors in a historic secondary offering for billions of dollars to support its flailing business. The falsely inflated financial statements also allowed the Company to acquire the SK Group, the largest energy provider in South Korea, to form a joint venture in South Korea.

6.     Conveniently, it was not until after these events that Plug Power filed    a Notification of Late Filing with the SEC on Form 12b-25 on March 2, 2021. The notification revealed that Plug Power was undertaking a "review and assessment of the treatment of certain costs with regards to  classification between Research and Development versus Costs of Goods Sold, the recoverability  of right of use assets associated with certain leases, and certain internal controls over these and  other areas." The Notification of Late Filing further revealed that "[i]t is possible that one or more  of these items may result in charges or adjustments to current and/or prior period financial  statements."

7.     Several weeks later on March 16, 2021, the Company announced that the "previously issued financial  statements as of and for the years ended December 31, 2019 and 2018, and as of and for each of  the quarterly periods ended March 31, 2020 and 2019, June 30, 2020 and 2019, and September 30,  2020 and 2019" could all no longer be relied upon and the Company would need to file a  restatement due to, *inter alia*, "errors in accounting primarily relating to (i) the reported book value  of right of use assets and related finance obligations ("ROU Accounting"), (ii) loss accruals for   certain service contracts, (iii) the impairment of certain long-lived assets, and (iv) the classification    of certain expenses previously included in research and development costs [.]"

8.     Defendants allowed the Company to continue an accounting scheme which caused the Company to overstate R&D expenses by an aggregate $62.9 million or 112.9% which heavily inflated reported gross margins to hide higher fuel delivery costs as research and development

3

("R&D") expenses. Millions of dollars in fuel costs were shielded from negatively impacting cost of revenue and profits; and made Plug Power's business model appear to be successful when, in fact, it was not. The misclassification also negatively impacted EBITDA reported during 2020 because restating the fuel delivery costs increased the loss accruals required for Plug Power's extended maintenance contracts.

9.      Furthermore, the Company was forced to admit its internal controls suffered from material deficiencies. The Board's utter failure to establish and monitor internal controls was at the root of the financial misstatements. Material weaknesses[1] were identified in the Company's internal control over financial reporting as of December 31, 2021, 2020, 2019 and 2018. As of December 31, 2021, the Company's disclosure controls and procedures were still not effective because of material weaknesses in internal control over financial reporting. According to the Company's SEC filings, the Company does not expect to complete its remediation plan to improve its internal controls over financial reporting until sometime during the year ending December 31, 2022.

10.      Additionally, Defendants' misconduct has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to several federal securities fraud class action litigation (collectively, the "Securities Class Actions").

11.      Furthermore, the Company is now required to expend its resources to implement an extensive remediation plan to improve its internal controls over financial reporting. The Company has also suffered massive losses from the waste of corporate assets as a result of the unjust

---

[1] A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis.

enrichment of Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein as a result of the falsely inflated financial results.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C.§ 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's claims also raise  a federal question pertaining to the claims made in the Securities Class Actions based on violations  of the Exchange Act.

13.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This shareholder derivative action is not a collusive action to confer jurisdiction on a court of  the United States that it would not otherwise have.

16.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

17.     Plaintiff is and was at all relevant times a shareholder of Nominal Defendant, Plug Power.  Plaintiff is a citizen of the State of California.

18.     Nominal Defendant Plug Power is a Delaware corporation with its headquarters located at 968 Albany Shaker Road, Latham, New York, 12110.

19.     Defendant Andrew Marsh ("Marsh") has served as the Company's CEO, President and director since April 8, 2008. Defendant Marsh capitalized on the Company's inflated stock price by selling 43% of his holdings for approximately $37.7 million, when Plug Power's common stock price was at its high and just six weeks prior to announcing its need to restate years of financial statements. Upon information and belief, Defendant Marsh is a citizen of New York.

20.     Defendant Paul B. Middleton ("Middleton") is the Company's CFO. Defendant Middleton profited by netting approximately $7.6 million from insider sales. Upon information and belief, Defendant Middleton is a citizen of New York.

21.     Defendant Maureen O. Helmer ("Helmer") has served as a director since 2004 and is a member of the Audit Committee and Chairperson of the Corporate Governance and Nominating Committee. Upon information and belief, Defendant Helmer is a citizen of New York.

22.     Defendant George C. McNamee ("McNamee") has served as a director and Chairman of the Board since 1997 and is a member of the Compensation Committee. Upon information and belief, McNamee is a citizen of New York.

23.     Defendant Gregory L. Kenausis ("Kenausis") has served as a director since 2013 and is the Chairperson of the Audit Committee. Upon information and belief, Defendant Kenausis is a citizen of Switzerland.

24.     Defendant Johannes Minho Roth ("Roth") has served as a director since 2013 and is a member of the Compensation and Corporate Governance Committees. Upon information and belief, Defendant Roth is a citizen of Switzerland.[2]

---

[2] According to the Company's most recent Proxy Statement filed with the SEC on May 2, 2022, Roth has informed the Board he will not stand for re-election and his term and service as a director will expire on June 30, 2022.

25.     Defendant Lucas P. Schneider ("Schneider") has served as a director since 2017 and a member of the Corporate Governance Committee. Upon information and belief, Defendant Schneider is a citizen of Texas.

26.     Defendant Jonathan Silver ("Silver") has served as a director since 2018 and is a member of the Corporate Governance Committee.  Upon information and belief, Defendant Silver is a citizen of Washington, D.C.

27.     Defendant Gary K. Willis ("Willis") has served as a director since 2003 and is a member of the Audit Committee and Chairperson of the Compensation Committee.   Upon information and belief, Defendant Willis is a citizen of Connecticut.

28.     Defendants Middleton, McNamee, Willis, Helmer, Marsh, Roth, Kenausis, Schneider, and Silver are collectively referred to herein as the "Defendants" or the "Individual Defendants."

## BOOKS-AND-RECORDS DEMAND

29.     On October 29, 2021, counsel for Plaintiff served a demand on Plug Power for production of its relevant "books  and  records" pursuant to Delaware General Corporation Law Code § 220 and Delaware Common Law (the "Demand").

30.     Ultimately, Plug Power produced a limited set of documents, subject to a confidentiality agreement between the parties.

31.     Plug Power's production, though heavily redacted, provides the necessary evidence that Defendants had knowledge of and involvement in the wrongdoing alleged herein and sat idly by while they approved and signed off on numerous false and misleading statements were issued on behalf of the Company.

7

32.     Defendants' knowledge of and involvement in the wrongdoing alleged herein excuses Plaintiff from making a demand on them before commencing this action because it would be futile for him to do so.  The particular allegations supporting this determination are set forth below.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

33.     By virtue of their positions as officers and directors of Plug Power, and because of their ability to control the business and corporate affairs of Plug Power, Defendants owed Plug Power and its stockholders fiduciary obligations of good faith, loyalty, and candor, and they were required to do their utmost to control and manage Plug Power in a fair, just, honest, and equitable manner. Defendants were required to act in the best interests of Plug Power and its stockholders and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Plug Power and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

34.     Defendants, because of their positions of control and authority as directors or officers of Plug Power, directly or indirectly exercised control over the wrongful acts complained of herein. Because of their advisory, executive, managerial and directorial positions within Plug Power, each of the Defendants had knowledge of material, nonpublic information regarding the Company.

35.     In the discharge of their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of Plug Power. Plug Power represents that its Directors are expected to spend the time and effort necessary to properly discharge their responsibilities, which specifically include:

8

- exercising their business judgment in good faith;

- acting in what they reasonably believe to be the best interest of all stockholders;

- becoming and remaining well-informed about the Company's business and operations and general business and economic trends affecting the Company;

- and ensuring that the business of the Company is conducted so as to further the long-term interests of its stockholders.

    36.    Plug Power's Directors are also responsible for overseeing its  risk management process, focusing on general risk management strategy, the most significant risks facing the Company, and overseeing the implementation of risk mitigation strategies by management.

    37.    According to the Audit Committee Charter and Plug Power's public SEC filings, the Audit Committee owed several additional duties to Plug Power. The Audit Committee is responsible for appointing, compensating, retaining, evaluating, terminating and overseeing the Company's independent registered public accounting firm; discussing with the Company's independent registered public accounting firm their independence from management; reviewing with the Company's independent registered public accounting firm the scope and results of their audit; approving all audit and permissible non-audit services to be performed by the Company's independent registered public accounting firm; reviewing and monitoring our accounting principles, accounting policies, financial and accounting controls and compliance with legal and regulatory requirements; and establishing procedures for the confidential anonymous submission of concerns regarding questionable accounting, internal controls or auditing matters.

    38.    The Audit Committee is also responsible for "overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the interim and annual financial statements that we file with the SEC."

39.     Thus, the oversight of Plug Power's internal and disclosure controls as well as the risks involved with acquiring and integrating Gander into Plug Power, fell squarely within the direct oversight responsibilities of the Plug Power Board and its Audit Committee.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company and its Capital-Intensive Business

40.     Plug Power provides comprehensive hydrogen fuel cell turnkey solutions focused on systems used to power electric motors in the electric mobility and stationary power markets. Plug Power primarily provides fuel cells for forklifts operating in warehouses of some of the world's largest retail-distribution and manufacturing businesses, including Amazon, Walmart, and Home Depot.

41.     Plug Power sells itself as building the hydrogen economy by serving as the leading provider of hydrogen fuel cell ("HFC") turnkey solutions amid an ongoing paradigm shift in the power, energy, and transportation industries to address climate change and energy security, while providing efficiency gains and meeting sustainability goals. Plug Power created the first commercially viable market for HFC technology. As a result, the Company has deployed over 40,000 fuel cell systems for e-mobility and has become the largest buyer of liquid hydrogen, having built and operated a hydrogen highway across North America.

42.     As detailed herein, Plug Power is a capital-intensive business, requiring cash infusions to bring its technology to the market. The Company raised over $1 billion from investors by relying on its inflated financial results from the fiscal years 2018, 2019, and 2020.

### Defendants Allowed the Company to File Numerous False and Misleading Filings with the SEC Regarding its Financial Results and Internal Controls

43.     During the wrongdoing alleged herein, Defendants allowed the Company to issue false and misleading statements in violation of GAAP and SEC regulations governing the reporting

of the Company's financial results and the maintenance of an effective system of internal control over financial reporting and public disclosures. This false accounting required a restatement of almost five years of financial statements.

44.     Additionally, the Company issued numerous earnings press releases and quarterly reports and the Board failed in its duty to adequately and properly review and assess the Company's press releases during the period of wrongdoing alleged herein and as a result, the Company violated GAAP standards and SEC rules and regulations.

45.     The false and misleading SEC documents filed by Plug Power were red flags that should have warned the Defendants that Plug Power's public statements and SEC filings required far more scrutiny by the Board than they had been given.

### 2018 Financial Results

46.     The Audit Committee met on March 6, 2019. Directors present at the meeting included Greg Graves, Gary K. Willis, Gregory L. Kenausis, Maureen O. Helmer, George C. McNamee, Andrew Marsh, Johannes Minho Roth, Lucas P. Schneider, and Jonathan Silver. (Bates #220_0000001).[3]

47.     During the meeting, the Audit Committee reviewed multiple documents, SEC filings and financial results, including, but not limited to:

> a. the 2018 year-end reporting, including the 2018 10K and significant Q4 transactions;
> b. the 2018 integrated audit performed by KPMG;
> c. the Audit Committee checklist; and
> d. Sarbanes-Oxley requirements.

(220_0000002).

---

[3] One of the grounds for Plaintiff's allegations is the review of the limited and heavily redacted books and records produced by Plug Power all of which are expressly incorporated by reference consistent with the incorporation condition pursuant to *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752 (Del. Ch. Feb. 2, 2016).

48.     The Audit Committee Checklist required the Audit Committee to do the following:



(220_0000015-23).

49.     The Audit Committee reviewed the Audit Committee Checklist at every Audit Committee meeting during the Relevant Period.

50.     The Audit Committee passed resolutions approving the retention of KPMG as auditors for 2019, approving the 2018 Form 10-K, and granted authority to Plug Power's executives to act on behalf of the Audit Committee to fulfill these resolutions. (220_0000002). KPMG had been Plug Power's auditor since 2011.

51.     KPMG presented to the Audit Committee and informed them of their duty under Sarbanes-Oxley Section 404 to "assess the effectiveness of [internal controls over financial

reporting] as of the end of each financial reporting period and include a written assessment in its Form 10-K." (220_0000028-31).

52.     KPMG further informed the Audit Committee of its duty to have the Company's auditors audit the effectiveness of the Company's internal controls over financial reporting. The Audit Committee was made aware that KPMG, as auditors, were reliant on management's work to process documents, test controls, and the sample sizes of the tests. *Id.* As a result, it was and is the duty of the Audit Committee to provide accountability to the Company's management so that KPMG can provide accurate financial reporting. Indeed, the Audit Committee Checklist that the Committee reviewed every meeting said as much. *Id.*

53.     The Audit Committee was informed that the Company had significant deficiencies in the areas of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Despite this red flag, both the Audit Committee and KPMG decided that the Company's internal controls were effective as of December 31, 2018. (220_00000030).  This red flag should have prompted the Board to immediately undertake a review and analysis of Plug Power's accounting policies and procedures or to better oversee the internal controls already in place.

54.     In addition, the Audit Committee completed a year-end review of 2018, KPMG's integrated audit result, and did an analysis of the quality of KPMG's audit. Lastly, the Audit Committee reviewed the results and end of interim financial review results for 2018. After discussion, the Audit Committee approved the 2018 10K, the 2018 integrated audit, agreed that they were in compliance with Sarbanes-Oxley, and retained KPMG for fiscal year 2019. The meeting lasted from 10:00 AM and finished at 11:00 AM. (220_0000001-2).

55.     Specifically, KPMG informed the Audit Committee that the Company had deficiencies in its internal controls related to █████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████

56.     A week after this Board meeting, Plug Power filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 Form 10-K") with the SEC on March 13, 2019.  Defendants Marsh, Middleton, Schneider, Helmer, Silver, Kenausis, McNamee, Roth and Willis signed the 2018 Form 10-K.  Concerning the Company's internal controls, the Form 10-K stated the following:

*(a) Evaluation of Disclosure Controls and Procedures*

As required by Rule 13a 15(b) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), we have carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, of the effectiveness, as of the end of the period covered by this report, of the design and operation of our "disclosure controls and procedures" as defined in Rule 13a-15(e) promulgated by the SEC under the Exchange Act. Based upon that evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures, as of the end of such period, were adequate and effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information was accumulated and communicated to management, as appropriate, to allow timely decisions regarding required disclosure.

*(b) Management's Annual Report on Internal Control over Financial Reporting*

14

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act. The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles, and includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;
- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. generally accepted accounting principles and, that receipts and expenditures of the Company are being made only in accordance with authorization of management and directors of the Company; and
- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. The Company's management, including our Chief Executive Officer and our Chief Financial Officer, assessed as of December 31, 2018 the effectiveness of the Company's internal control over financial reporting. In making this assessment, management used the criteria set forth in the framework in Internal Control— Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on this assessment, management has concluded that the Company maintained effective internal control over financial reporting as of December 31, 2018 based on the specified criteria. The Company's independent registered public accounting firm has issued a report on the effectiveness of the Company's internal control over financial reporting as of December 31, 2018, which is included in Item 8 of this Annual Report on Form 10-K and incorporated herein by reference.

*(c) Changes In Internal Control Over Financial Reporting*

During the quarter ended December 31, 2018, there were no changes in our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

57.     The Form 10-K also discussed recent accounting for ROU assets and leases.  The

2018 Form 10-K stated the following in relevant part:

*Leases*

The Company is a lessee in several noncancelable (1) operating leases, primarily related to sale/leaseback transactions with financial institutions for deployment of the Company's products at certain customer sites, and (2) finance leases, also primarily related to sale/leaseback transactions with financial institutions for similar commercial purposes. The Company accounts for leases in accordance with ASC Topic 842, Leases (ASC Topic 842). See Recently Adopted Accounting Standards, as the Company has early adopted ASC Topic 842 in 2018. The Company determines if an arrangement is or contains a lease at contract inception. The Company recognizes a right of use (ROU) asset and a lease liability (i.e. finance obligation) at the lease commencement date. For operating leases, the lease liability is initially measured at the present value of the unpaid lease payments at the lease commencement date. For finance leases, the lease liability is initially measured in the same manner and date as for operating leases, and is subsequently measured at amortized cost using the effective interest method. Key estimates and judgments include how the Company determines (1) the discount rate it uses to discount the unpaid lease payments to present value, (2) lease term and (3) lease payments.

- ASC Topic 842 requires a lessee to discount its unpaid lease payments using the interest rate implicit in the lease or, if that rate cannot be readily determined, its incremental borrowing rate. Generally, the Company cannot determine the interest rate implicit in the lease because it does not have access to the lessor's estimated residual value or the amount of the lessor's deferred initial direct costs. Therefore, the Company generally uses its incremental borrowing rate as the discount rate for the lease. The Company's incremental borrowing rate for a lease is the rate of interest it would have to pay on a collateralized basis to borrow an amount equal to the lease payments under similar terms.
- The lease term for all of the Company's leases includes the noncancelable period of the lease, plus any additional periods covered by either a Company option to extend (or not to terminate) the lease that the Company is reasonably certain to exercise, or an option to extend (or not to terminate) the lease controlled by the lessor.
- Lease payments included in the measurement of the lease liability comprise fixed payments, and the exercise price of a Company option to purchase the underlying asset if the Company is reasonably certain to exercise the option.

The ROU asset is initially measured at cost, which comprises the initial amount of the lease liability adjusted for lease payments made at or before the lease commencement date, plus any initial direct costs incurred less any lease incentives received. For operating leases, the ROU asset is subsequently measured throughout the lease term at the carrying amount of the lease liability, plus initial direct costs, plus (minus) any prepaid (accrued) lease payments, less the unamortized balance of lease incentives received. Lease expense for lease payments is recognized on a straight-line basis over the lease term. For finance leases, the ROU asset is subsequently amortized using the straight-line method from the lease

16

commencement date to the earlier of the end of its useful life or the end of the lease term unless the lease transfers ownership of the underlying asset to the Company or the Company is reasonably certain to exercise an option to purchase the underlying asset. In those cases, the ROU asset is amortized over the useful life of the underlying asset. Amortization of the ROU asset is recognized and presented separately from interest expense on the lease liability. The Company's leases do not contain variable lease payments. ROU assets for operating and finance leases are periodically reviewed for impairment losses. The Company uses the long-lived assets impairment guidance in ASC Subtopic 360-10, Property, Plant, and Equipment – Overall, to determine whether an ROU asset is impaired, and if so, the amount of the impairment loss to recognize. No impairment losses have been recognized to date. The Company monitors for events or changes in circumstances that require a reassessment of one of its leases. When a reassessment results in the remeasurement of a lease liability, a corresponding adjustment is made to the carrying amount of the corresponding ROU asset. Operating and finance lease ROU assets are presented within leased property, net on the consolidated balance sheet. The current portion of operating and finance lease liabilities is included in finance obligations within current liabilities and the long-term portion is presented in finance obligations within noncurrent liabilities on the consolidated balance sheet. The Company has elected not to recognize ROU assets and lease liabilities for short-term leases that have a lease term of 12 months or less. The Company has elected to apply the short-term lease recognition and measurement exemption for other classes of leased assets. The Company recognizes the lease payments associated with its short-term leases as an expense on a straight-line basis over the lease term.

**2019 Financial Results**

58.     On March 10, 2020, Plug Power filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 Form 10-K") with the SEC. Defendants Marsh, Middleton, Schneider, Helmer, Silver, Kenausis, McNamee, Roth and Willis signed the 2019 Form 10-K. The 2019 Form 10-K contained substantially similar statements concerning the Company's internal controls as the 2018 Form 10-K.

59.     Concerning ROU assets and leases, the 2019 From 10-K stated the following:

**Leases**

The Company is a lessee in noncancelable (1) operating leases, primarily related to sale/leaseback transactions with financial institutions for deployment of the

17

Company's products at certain customer sites, and (2) finance leases, also primarily related to sale/leaseback transactions with financial institutions for similar commercial purposes. The Company accounts for leases in accordance with Accounting Standards Codification (ASC) Topic 842, Leases (ASC Topic 842), as amended, which was adopted in 2018 (see Recently Adopted Accounting Standards). The Company determines if an arrangement is or contains a lease at contract inception. The Company recognizes a right of use (ROU) asset and a lease liability (i.e. finance obligation) at the lease commencement date. For operating leases, the lease liability is initially measured at the present value of the unpaid lease payments at the lease commencement date. For finance leases, the lease liability is initially measured in the same manner and date as for operating leases and is subsequently measured at amortized cost using the effective interest method. Key estimates and judgments include how the Company determines (1) the discount rate it uses to discount the unpaid lease payments to present value, (2) the lease term and (3) the lease payments.

- ASC Topic 842 requires a lessee to discount its unpaid lease payments using the interest rate implicit in the lease or, if that rate cannot be readily determined, its incremental borrowing rate. Generally, the Company cannot determine the interest rate implicit in the lease because it does not have access to the lessor's estimated residual value or the amount of the lessor's deferred initial direct costs. Therefore, the Company generally uses its incremental borrowing rate as the discount rate for the lease. The Company's incremental borrowing rate for a lease is the rate of interest it would have to pay on a collateralized basis to borrow an amount equal to the lease payments under similar terms.
- The lease term for all of the Company's leases includes the noncancelable period of the lease, plus any additional periods covered by either a Company option to extend (or not to terminate) the lease that the Company is reasonably certain to exercise, or an option to extend (or not to terminate) the lease controlled by the lessor.
- Lease payments included in the measurement of the lease liability comprise fixed payments, and the exercise price of a Company option to purchase the underlying asset if the Company is reasonably certain to exercise the option.

The ROU asset is initially measured at cost, which comprises the initial amount of the lease liability adjusted for lease payments made at or before the lease commencement date, plus any initial direct costs incurred less any lease incentives received. For operating leases, the ROU asset is subsequently measured throughout the lease term at the carrying amount of the lease liability, plus initial direct costs, plus (minus) any prepaid (accrued) lease payments, less the unamortized balance of lease incentives received. Lease expense for lease payments is recognized on a straight-line basis over the lease term. For finance leases, the ROU asset is subsequently amortized using the straight-line method from the lease commencement date to the earlier of the end of the useful life of the underlying

18

asset or the end of the lease term unless the lease transfers ownership of the underlying asset to the Company or the Company is reasonably certain to exercise an option to purchase the underlying asset. In those cases, the ROU asset is amortized over the useful life of the underlying asset. Amortization of the ROU asset is recognized and presented separately from interest expense on the lease liability. The Company's leases do not contain variable lease payments. ROU assets for operating and finance leases are periodically reviewed for impairment losses. The Company uses the long-lived assets impairment guidance in ASC Subtopic 360-10, Property, Plant, and Equipment – Overall, to determine whether an ROU asset is impaired, and if so, the amount of the impairment loss to recognize. No impairment losses have been recognized to date. The Company monitors for events or changes in circumstances that require a reassessment of one of its leases. When a reassessment results in the remeasurement of a lease liability, a corresponding adjustment is made to the carrying amount of the corresponding ROU asset. Operating and finance lease ROU assets are presented within leased property, net on the consolidated balance sheets. The current portion of operating and finance lease liabilities is included in finance obligations within current liabilities and the long-term portion is presented in finance obligations within noncurrent liabilities on the consolidated balance sheets. The Company has elected not to recognize ROU assets and lease liabilities for short-term leases that have a lease term of 12 months or less. The Company has elected to apply the short-term lease recognition and measurement exemption for other classes of leased assets. The Company recognizes the lease payments associated with its short-term leases as an expense on a straight-line basis over the lease term.

60.     On May 7, 2019, the Audit Committee convened via telephone. Directors present at the meeting included Greg Graves, Gary K. Willis, Maureen O. Helmer, Andrew Marsh, and George C. McNamee. (220_0000221-222).

61.     During the meeting, Graves led a review of the Audit Committee checklist and approved proposed resolutions. *Id.* The Audit Committee also reviewed the Company's first quarter financial results for 2019, reviewing a draft 10Q for the quarter and approving the 10Q. The Audit Committee also reviewed an SEC Comment letter received by the Company. (220_00000241). The meeting began at 8:00 AM and was finished at 9:30 AM. (220_0000221).

62.     On July 30, 2019, at 2:00 AM, the Audit Committee convened via telephone. (220-00000325). Directors present at the meeting were Gregory L. Kenausis, Gary K. Willis, Maureen O. Helmer, George C. McNamee, Andrew Marsh, Lucas P. Schneider, and Jonathan Silver. *Id.*

The Audit Committee approved resolutions including approval of the Audit Committee Charter, unanimously approving the Financial Risk Assessment, including portions of the Assessment ████████████████████████████████████ and authorizing certain executives to perform actions necessary to implement the resolutions. *Id.*

63.     In addition, the Audit Committee reviewed the Company's internal controls and Sarbanes-Oxley compliance. The Audit Committee also reviewed the Company's 2019 second quarter financial results.

64.     The Audit Committee also reviewed the Audit Committee Charter. The charter stated in relevant part, "The Audit Committee shall review and discuss with management…the Company's annual audited financial statements, including (a) all critical accounting policies and practices used or to be used by the Company, (b) the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to the filing of the Company's annual report on Form 10-K, and (c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements. (220-00000333). The meeting adjourned at 3:20 AM. (220_00000221-222).

65.     On August 5, 2019, the Audit Committee met via telephone once again. Directors present at the meeting included Gregory L. Kenausis, Gary K. Willis, Maureen O. Helmer, George C. McNamee, and Andrew Marsh. (220_00000425-426). The meeting began at 1:00 PM and ended at 2:00 PM. *Id.*

66.     The Audit Committee reviewed the Audit Committee checklist and was provided with an update on the Company's 2019 second quarter financial results. *Id.* In addition, Dean Geesler and Andrew Allin provided KPMG's update on the Company's audit status. Following the KPMG presentation, the Audit Committee reviewed a new draft of the Company's 2019 10Q

for the second quarter of 2019 and unanimously approved it. *Id.* The Audit Committee passed resolutions approving the 2019 10Q for the second quarter and granted authority to the Company's executives to implement the resolutions of the Audit Committee. *Id.*

67.     The Audit Committee did not meet again until November 6, 2019. (220_00000531-536). Directors present at the meeting included Gregory L. Kenausis, Gary K. Willis, Maureen O. Helmer, George C. McNamee, and Andrew Marsh. *Id.* The meeting began at 10:00 AM and finished at 11:00 AM. *Id.*

68.     The Audit Committee reviewed the Audit Committee Checklist and then engaged in a review of the financial results for the third quarter of 2019. *Id.* The Audit Committee then went on to review the Company's compliance with Sarbanes-Oxley requirements and internal controls, receiving a presentation from Chief Accounting Officer Marty Hull regarding management's assessment of internal controls. *Id.* The Audit Committee then reviewed a draft of the Form 10Q for the third quarter of 2019, and conducted a "detailed" discussion of the disclosure committee's actions. *Id.*

69.     KPMG provided an overview of the third quarter financial results. *Id.* The Audit Committee then reviewed estimates for preparing financial statements. *Id.* After this discussion, the Audit Committee resolved to approve the Form 10Q for the third quarter 2019, and adjourned the meeting. *Id.*

70.     On March 4, 2020, the Audit Committee met at 10:00 AM. Present at the meeting were Directors Gregory L. Kenausis, Gary K. Willis, Maureen O. Helmer, George C. McNamee, Andrew Marsh, Johannes Minho Roth, Lucas P. Schneider, and Jonathan Silver. (220_00000678-682).

21

71.     The Audit Committee reviewed its checklist. *Id.* They then reviewed their 2019 year-end reporting and significant fourth quarter transactions. *Id.* Marty Hull, Chief Accounting Officer, provided an update on significant fourth quarter transactions and the Company's Sarbanes-Oxley compliance. *Id.* The Audit Committee then reviewed a draft of the 2019 Form 10K and then instructed management to finalize the draft and circulate for Board signatures. *Id.*

72.     KPMG made a presentation to the Audit Committee regarding services to the Company for 2020 and the meeting was adjourned. *Id.* In KPMG's presentation, they informed the Audit Committee of their Sarbanes-Oxley responsibilities, specifically, the Audit Committee's responsibility to test the effectiveness of the Company's internal controls. (220_00000820).

███████████████████████████████████████████████████████

███████████████████████████████████

**2020 Financial Reports**

73.     On May 6, 2020, the Audit Committee convened. (220_00000935-940). Present at this meeting were Directors Gregory L. Kenausis, Gary K. Willis, Maureen O. Helmer, Andrew Marsh, and George C. McNamee. *Id.*

74.     The Audit Committee reviewed the Audit Committee Checklist and reviewed proposed resolutions. *Id.* It then reviewed the Company's financial results for the first quarter of 2020 and reviewed the Company's draft 10Q for the quarter. *Id.* The Audit Committee also approved the resolutions presented including resolutions to approve the first quarter Form 10Q and authorizing the Company's executives to file the Form 10Q. *Id.*

75.     On August 4 and 5, 2020, the Audit Committee convened. (220_00001038-1040) Present at the meeting were Directors Gregory L. Kenausis, Gary K. Willis, Maureen O. Helmer,

George C. McNamee, Andrew Marsh, Lucas P. Schneider, Jonathan Silver, and Johannes Minho Roth. *Id.* The meeting was convened at 8:45 AM on August 4, 2020. *Id.*

76. At the meeting, the Audit Committee was given an update on the Company's internal controls and Sarbanes-Oxley Section 404 compliance. *Id.* They also reviewed the Company's management's assessment of the Company's financial risks, enterprise risk, and IT risks. *Id.*

77. KPMG provided a review of the Company's financial status. *Id.* KPMG spent a significant amount of time providing an overview of the Company's internal controls and risk assessment. 220_00001140-1174. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████ 220_00001168. The meeting was adjourned at 8:55 AM, and was reconvened at 10:00 AM on April 5, 2020. (220_00001039). At that time the Audit Committee received an update of the Company's financial results for the second quarter of 2020. *Id.* The Audit Committee then reviewed a draft of the Company's 10Q for the second quarter of 2020. *Id.* At the end of the meeting, the Audit Committee approved the resolutions presented to them including a resolution to confirm and approve the Company's revised Audit Committee Charter, Financial Risk Assessment, and the second quarter Form 10Q. (220_00001040). The Audit Committee also authorized the Company's executives to implement the resolutions passed by the Audit Committee. *Id.*

78. On November 6, 2020, the Audit Committee convened at 3:00 PM. (220_00001240-1348). Present at this meeting were Directors Gregory L. Kenausis, Gary K. Willis, Maureen O. Helmer, George C. McNamee, Andrew Marsh, Jonathan Silver, Lucas P. Schneider, and Johannes Minho Roth. (220_00001240).

79.     The Audit Committee reviewed the Audit Committee Checklist. *Id.* It then reviewed the financial results for the third quarter of 2020 including a discussion of the Company's management's assessment of internal control and Sarbanes-Oxley requirements for the fiscal year 2020. *Id.* The Audit Committee then reviewed the draft Form 10Q for the third quarter of 2020. *Id.* Chief Accounting Officer Marty Hull provided information on the internal controls relied upon to make sure that the Company's financial reporting was accurate and complete, including a detailed discussion of the Disclosure Committee's operations. (220_00001241).

80.     KPMG then led the Audit Committee in a review of the third quarter 2020 financial results, including a review of the Company's quarterly controls. *Id.* The Audit Committee approved the Form 10Q for the third quarter of 2020. *Id.*

81.     Following the discussion of financial results, the Audit Committee discussed the treatment of the Amazon warrants and the impact on financial reports of the Company. *Id.* The Audit Committee was advised that KPMG, Deloitte, and the Company's senior management were involved in discussions regarding the volatility of Amazon warrants. *Id.*

82.     On May 8, 2020, August 10, 2020 and November 9, 2020, Plug Power ultimately filed its Quarterly Reports on Forms 10-Q for the first, second, and third quarters for the 2020 fiscal year. The Forms 10-Q stated that the Company's disclosure controls and procedures are "effective."

**2020 Shareholder Letter**

83.     On November 9, 2020 Plug Power issued a stockholder letter, which it posted to its website and attached to a Current Report on Form 8-K filed with the SEC on that same day. The November 9, 2020 letter contained the Company's financial results for the third quarter ended September 30, 2020. The stockholder letter claimed that the Company achieved record third

24

quarter gross billings of $125.6 million. It also stated that Plug Power was raising its full year gross

billing guidance to $325-$330 million, from $310 million.

**2021 Shareholder Letter**

84.     On February 25, 2021 Plug Power released its fourth quarter and full year 2020

financial results in a letter to shareholders, which was posted to its website and attached to a

Current Report on Form 8-K filed with the SEC on that same day.

85.     The 2020 shareholder letter falsely stated that the Company's R&D expenses were

$18.89 million and $51.02 million for the fourth quarter of 2020 and the entirety of 2020.  Plug

Power also reported gross billings of $96.3 million for the fourth quarter and $337 million for the

full year ended December 31, 2020.

### Plug Power is Desperate for a Cash Infusion and the Board Approved a Secondary Offering Based on Overstated Financial Statements

86.     On November 24, 2020, Plug Power announced that it had completed one of the

largest bought equity deal transactions in the broader clean-tech sector which generated

approximately $1 billion in capital and was the largest capital raise in the Company's history.

87.     The Company noted that "[t]he capital raise uniquely positions Plug Power to

execute and accelerate on its green hydrogen strategy as well as other strategic growth initiatives."

### Defendant Middleton Cashes in on the Company's Artificially Inflated Stock Price

88.     On December 24, 2020, just 30 days after Plug Power's $1 billion offering at $22

per share, Defendant Middleton sold 216,667 shares of his personally held Plug Power stock at a

price of $35.1299 per share. This sale netted Defendant Middleton proceeds of approximately $7.6

million.

89.     Defendant Middleton's sale was made pursuant to a Rule 10b5-1 trading plan that was established just three months earlier in September 2020 while Defendants were reporting false financial metrics.

90.     In order to effectuate this sale, Defendant Middleton exercised options that were not due to expire until 2028 and 2029 - eight to nine years before their expiration.

91.     Defendant Middleton's decision to exercise his options eight to nine years before their expiration further shows that he knew Plug Power's stock price did not reflect Plug Power's true financial condition.

### SK Group's Purchase of Plug Power's Common Stock to Establish Hydrogen Joint Venture

92.     On January 6, 2021, Plug Power and SK Group, the largest energy provider in South Korea, announced their intention to form a strategic partnership to accelerate hydrogen as an alternative energy source in Asian markets.

93.     SK Group agreed to make a $1.5 billion strategic investment in Plug Power. Under the terms of the investment, which closed later in the first quarter of 2021, a United States subsidiary of SK Group would make the $1.5 billion investment in Plug Power by acquiring approximately 51.4 million shares of common stock. The investment was expected to represent an approximate 9.6% ownership of Plug Power's issued and outstanding common stock.

94.     On February 25, 2021, Plug Power announced the completion of the $1.6 billion capital investment.  SK Group paid Plug Power and acquired Plug Power's common stock one week before the Company disclosed on March 2, 2021 that its financial disclosures were materially false and misleading.

### Defendant Marsh Sells Nearly Half His Shares at Artificially Inflated Prices

26

95.     In the two weeks following the Company's announcements of the SK Group deal, the Company's stock price increased by almost 90%.

96.     On January 19, 2021, Defendant Marsh sold 573,268 shares of his personally held Plug Power stock at prices ranging from $62.6504 to $68.3109 per share in a series of seven transactions. Defendant Marsh's sale was purportedly made pursuant to a Rule 10b5-1 trading plan that was instituted while Defendants issued materially false and misleading financial statements.

97.     These sales—which reduced Defendant Marsh's holdings by 43% from 1.322 million shares to 748,680 shares—netted Defendant Marsh proceeds of approximately $37.7 million. In order to effectuate the sale of 466,668 shares or 81% of his total shares sold on January 19, 2021, Defendant Marsh exercised options that would not expire until 2027.

98.     Defendant Marsh's decision to exercise his options seven years before their expiration further shows that he knew Plug Power's stock price was did not reflect Plug Power's true financial condition.

**Plug Power's Façade Comes Crashing Down**

99.     On February 24, 2021, the Audit Committee met via Zoom and telephone. (220_00001455-1461). Directors present at the meeting included Gregory L. Kenausis, Gary K. Willis, Maureen O. Helmer, Kimberly Harriman, George C. McNamee and Andrew Marsh. KPMG was also present via Michael Draves, Asad Chaudry, and Andrew Allin. *Id.* The meeting commenced at 2:00 PM. *Id.* The Audit Committee reviewed the Audit Committee Checklist and proposed resolutions. *Id.*

100.    The Audit Committee reviewed the Company's 2020 year-end reporting and noted significant fourth quarter transactions. *Id.* They also reviewed the Company's Sarbanes-Oxley compliance. *Id.* The Audit Committee then reviewed the Form 10K for the year 2020, and

27

approved the draft 10K for filing, authorizing management to finalize the draft and proceed with filing the 10K with the SEC. *Id.*

101.    The Audit Committee then discussed the status of the SEC Comment Letter. *Id.* Although no details were provided on any discussions of the SEC Comment Letter in these Committee Meeting minutes, the Company's 2020 Form 10-K notes that on Dec. 16, 2020 the Company received a comment letter from the SEC regarding accounting and financial disclosure matters and it was still in process of being resolved.

102.    After discussion of the SEC Comment Letter, KPMG led a discussion of the status of the 10K filing. *Id.* KPMG noted that the 2020 audit was substantially complete and the two primary areas of focus were the Amazon warrant transaction and the standalone selling price. KPMG noted a significant deficiency related to physical inventory, but KPMG reported that significant progress had been made between 2019 and 2020 to address this issue and any misstatement was unlikely to be material. *Id.* The Audit Committee asked if there were concerns as to Plug Power's ability to release earnings on February 25, 2021 or file the Company's Form 10K on March 1, 2021. KPMG stated there were no concerns regarding either issue. The meeting adjourned at 3:00 PM. *Id.*

103.    Just a few days after this meeting, on March 2, 2021, Plug Power filed a Notification of Late Filing with the SEC stating that it could not timely file its Annual Report on Form 10-K for FY2020 (the "2020 Form 10-K") by the filing deadline of March 1, 2021. The Notification stated the following in relevant part:

> For the year ended December 31, 2020, Plug Power Inc. (the "Company") became a large accelerated filer for the first time and, as a result, the Company has a shortened filing deadline of 60 days rather than 75 days to file its Annual Report on Form 10-K for the year ended December 31, 2020 (the "Form 10-K"). The Company requires additional time to complete the procedures relating to its year-

end reporting process, including the completion of the Company's financial statements and procedures relating to management's assessment of the effectiveness of internal controls, and the Company is therefore unable to file the Form 10-K by March 1, 2021, the prescribed filing due date. The Company is working diligently to complete the necessary work, including review and assessment of the treatment of certain costs with regards to classification between Research and Development versus Costs of Goods Sold, the recoverability of right of use assets associated with certain leases, and certain internal controls over these and other areas. It is possible that one or more of these items may result in charges or adjustments to current and/or prior period financial statements. The Company is still evaluating whether any such charges or adjustments would be required and, if required, whether any such charges or adjustments would be material; but any charges, if required, would be non-cash in nature and any such adjustments or charges would not impact the Company's guidance on forward projections. The Company expects to file the Form 10-K within the extension period provided under Rule 12b-25 under the Securities Exchange Act of 1934, as amended.

104.    A couple of weeks later on March 16, 2021, Plug Power issued a press release announcing that the Company needed to restate its prior financial results. The Form 8-K stated the following in relevant part:

On March 12, 2021, management and the Audit Committee of the Board of Directors (the "Audit Committee") of the Company, in consultation with KPMG LLP ("KPMG"), the Company's independent registered public accounting firm, determined that the Company's previously issued financial statements as of and for the years ended December 31, 2019 and 2018, and as of and for each of the quarterly periods ended March 31, 2020 and 2019, June 30, 2020 and 2019, and September 30, 2020 and 2019 (collectively, the "Prior Period Financial Statements"), should no longer be relied upon due to errors in accounting primarily relating to (i) the reported book value of right of use assets and related finance obligations ("ROU Accounting"), (ii) loss accruals for certain service contracts, (iii) the impairment of certain long-lived assets, and (iv) the classification of certain expenses previously included in research and development costs ((i) through (iv) collectively, the "Restatement Items"). In addition, the fourth quarter and full year 2020 financial results and related discussion included in the Company's shareholder letter furnished on the Form 8-K filed by the Company on February 25, 2021 should no longer be relied upon.

The Company and the Audit Committee have determined that these accounting changes will require a restatement of the Prior Period Financial Statements.

The Company also expects that its Form 10-K for the year ended December 31, 2020 will disclose a material weakness in its internal controls over financial reporting arising from the Restatement Items. As such, KPMG's report on the Company's internal control over financial reporting as of December 31, 2019 should no longer be relied upon.

The Company expects to restate its financial statements as of and for the years ended December 31, 2019 and 2018 and for each of the quarterly periods ended March 31, 2020 and 2019, June 30, 2020 and 2019, September 30, 2020 and 2019, and December 31, 2019, in its Form 10-K for the year ended December 31, 2020. The Company will not be able to file its Form 10-K for the year ended December 31, 2020 by the March 16, 2021 deadline, but it is working diligently to finalize the restated financial statements and to file its Form 10-K as soon as practicable.

The Company's internal review is ongoing and the Company may identify further errors. There can be no assurance that the actual effects of the error corrections will be only as described above.

105.    On May 11, 2021, the Audit Committee met at 3:00 PM via teleconference call. (220_00001632-1633). Directors present at the meeting included Gregory L. Kenausis, Gary K. Willis, Maureen O. Helmer, Kimberly Harriman, Andrew Marsh, George C. McNamee, Johannes Minho Roth, Lucas P. Schneider, Jonathan Silver, and Kyungyeol Song. *Id.*

106.    The meeting began with a review of the 2020 year end financials. *Id.* The Company's CFO, Paul Middleton, discussed the reasoning behind the Company having to delay the filing of their Form 10K for the fiscal year ended 2020. *Id.* The Audit Committee was informed about certain key restatement adjustments that would be made for 2018 and 2019 regarding internal controls over financial reporting. *Id.* They then discussed the Company's compliance, or failure to comply, with Sarbanes-Oxley requirements. *Id.*

107.    Audit Committee then reviewed the Form 10K for the year 2020 with help from

KPMG. (220_000011644-1667). KPMG notified the Audit Committee of defective internal

controls including:

      a.  Failure to properly update or change terms in the lease inventory file;
      b.  Failure to properly review calculation splits;
      c.  Failure to properly complete the Accounting Disclosures Checklist;
      d.  Failure to properly review bonus accruals;
      e.  Failure to properly review loss accruals; and
      f.  Failure to properly review ASC 606 disclosure completeness and accuracy.

*Id.*

108.    KPMG recommended that the Company put in place new impairment process

controls and recommended changes to the Company's internal controls. *Id.* KPMG also noted that

Defendants had likely caused the Company to make material misstatements regarding their

Internal Controls. *Id.*

109.    Specifically, KPMG noted that Defendants had caused the Company to:

a.  Overstate the Company's right of use assets by $112.7 million (220_00001648);

b.  Understating the provision for loss contracts related to serve for the years ended 2019 and 2018 by $5.3 million. *Id.*;

c.  A 2020 impairment of $6.4 million for ROUs and other assets. *Id.*;

d.  An overstatement of gross profits in 2019 and 2018 in the amounts of $19.5 million and $21.2 million respectively. *Id.*;

e.  Failure to disclose $1.8 million in preferred stock dividends in 2019. *Id.*;

f.  Failure to disclose $5.3 million in bonus expenses and payroll taxes in 2020. *Id.*; and

g.  Failure to disclose $2.4 million in right of use assets and lease liabilities in 2020. *Id.*

110.    KPMG went on to tell the Audit Committee that the Company's Board of Directors

had failed to "maintain a sufficient complement of trained, knowledgeable, resources to execute

their responsibilities with respect to internal control over financial reporting" and "[a]s a consequence, the Company did not conduct an effective risk assessment process that was responsive to changes in the Company's operating environment and did not design and implement effective...controls." (220_00001649).

111.    The Audit Committee meeting was adjourned at 5:00 PM. (220_000011644).

112.    A few days later on May 14, 2021, Plug Power announced that the Company had completed the restatement of its previously issued financial statements and filed its 2020 From 10-K with the SEC. The restatement was consistent with the key areas previously addressed in the Company's March 16 press release.

113.    According to the 2020 Form 10-K, the restatement corrected the following errors:

(a) $112.7 million overstatement of the right of use assets related to operating lease liabilities at December 31, 2019, due to the Company incorrectly calculating the operating lease liability associated with certain sale/ leaseback transactions;

(b) ($1.6) million understatement of benefit for loss contracts related to service on the Statement of operations for the year ended December 31, 2019, inclusive of the partial release of the 2018 accrual to the cost of services performed on fuel cells and related infrastructure, and a $5.3 million understatement of the provision for loss contracts for the year ended December 31, 2018, due to the Company not properly estimating the loss accrual related to extended maintenance contracts;

(c) $19.5 million and $21.2 million, overstatement of gross profit (loss) for the years ended December 31, 2019 and 2018, respectively, due to the Company not properly presenting certain costs related to research and development activities and cost of revenues;

(d) $1.8 million recording of a deemed dividend for certain conversions of the Company's Series e Convertible Preferred Stock settled in common stock during the year ended December 31, 2019;

(e) The Company determined that the amount recorded to accumulated deficit as of January 1, 2018 for a cumulative adjustment of approximately $3.4 million was the correction of an error in prior lease accounting. as a result of the correction of this error, the $3.4 million charge to accumulated deficit is now reflected in the beginning accumulated deficit for the 12 months ended December 31, 2018; and

32

(f) $5.3 million understatement of bonus expense and related payroll taxes for the three months ended September 30, 2020, due to the Company not properly estimating bonus expense for the nine-month period ended September 30, 2020.

114.    In correcting its misclassification of R&D expenses, this resulted in a corresponding increase in the Company's cost of revenue. The specific types of cost of revenue that were affected by this correction included sales of fuel cell systems and related infrastructure, services performed on fuel cell systems and related infrastructure, Power Purchase Agreements, and, notably, fuel delivered to customers.

115.    In addition to the fiscal years 2018 and 2019, the Company further revealed in its 2020 Form 10-K that it had improperly presented research and development expenses that should have been classified as costs of revenue for the fiscal years 2016 and 2017 and first three quarters of FY2020. Specifically, for FY2016, the Company misclassified $8.9 million. For FY2017, the Company misclassified $15.2 million. For the first quarter of FY2020, the Company misclassified $5.5 million. For the second quarter of FY2020, the Company misclassified $4.9 million. For the third quarter of FY2020, the Company misclassified $5.5 million.

116.    As part of the restatement, the Company increased the cost of fuel delivered to customers by the following amounts: for FY2018, $8.3 million; for FY2019, $8.9 million; for the first quarter of FY2020, $2.2 million; for the second quarter of FY2020, $2.0 million; and for the third quarter of FY2020, $2.8 million.

117.    In correcting its misclassification of cost of revenue as research and development expenses, Plug Power accordingly reduced its previously reported gross profit for the fiscal years 2016-2019 and the first three quarters of FY2020.

118.    This reclassification, along with other adjustments, caused nearly every reporting

period to report large gross losses except for FY2019 where the gross profit reported was cut by

over 60%.

119.    The 2020 Form 10-K also provided details regarding the Company's improper

assumptions in connection with loss accruals for certain service contracts, a type of the Company's

cost of revenue. Specifically, the Company identified the following flaw in its recording of loss

accruals:

> The Company recorded a provision for loss accrual during 2020 of $35.5 million,
> an increase of $35.9 million over the net benefit for loss contracts related to service
> recorded in 2019 of $394 thousand (as restated). The increase in the provision for
> loss accrual during 2020 was driven primarily by an increase in estimated projected
> costs to service units and an increase in the number of service contracts during
> 2020. The Company determined during 2020, based on historical experience, that
> certain cost down initiatives were taking longer to achieve than originally
> estimated. As a result, the Company increased its estimated projected costs to
> service fuel cell systems and related infrastructure.
>
> . . .
>
> The Company did not properly estimate the loss accrual related to its extended
> maintenance contracts. As a result of the error in classification of research and
> development costs discussed below, the Company did not consider all relevant
> historical costs when estimating future service costs when determining whether a
> loss accrual for extended maintenance contracts was necessary. Additionally, the
> Company did not consider the service costs related to hydrogen infrastructure, nor
> the provision for warrants, when estimating the need for a loss accrual on extended
> maintenance contracts. When properly considering these costs, additional loss
> accruals for extended maintenance contracts were required to be recorded. When
> properly considering these costs, additional loss accruals for extended maintenance
> contracts were required to be recorded. The corrections resulted in a ($1.6) million
> benefit for loss accrual for the year ended December 31, 2019, inclusive of the
> partial release of the 2018 loss accrual, and a provision for loss accrual of $5.3
> million for the year ended December 31, 2018.

120.    The 2020 Form 10-K further revealed that most of the $35.5 million loss accrual

for FY2020 was generated by the Company understating the provision for loss contracts related to

service during the third quarter of that year by $20.8 million.

34

121.    This loss accrual was understated because the Company misclassified fuel delivered to customers as a research and development expense instead of as a cost of revenue. This directly caused the Company's operating income to decrease by $20.8 million.

122.    The 2020 Form 10-K stated that Plug Power's management, including the Individual Defendants, under the oversight of the Company's Board, conducted an evaluation of the effectiveness of the Company's internal control over financial accounting. Based on this evaluation, the Company's management concluded that, as of December 31, 2020, the Company's internal control over financial reporting was not effective because of certain material weaknesses. Specifically, Company's management identified the following deficiency in internal control over financial reporting as of December 31, 2020:

> The Company did not maintain a sufficient complement of trained, knowledgeable resources to execute their responsibilities with respect to internal control over financial reporting for certain financial statement accounts and disclosures. As a consequence, the Company did not conduct an effective risk assessment process that was responsive to changes in the Company's operating environment and did not design and implement effective process-level controls activities in the following areas: presentation of operating expenses; accounting for lease-related transactions; identification and evaluation of impairment, loss-contract accrual, certain expense accruals, and deemed dividends; and timely identification of adjustments to physical inventory in interim periods.

123.    The 2020 Form 10-K further provided that "these deficiencies resulted in material misstatements that were identified and corrected in the consolidated financial statements as of and for each of the three years in the period ended December 31, 2020 and other historical periods...."

124.    The 2020 Form 10-K also detailed the Company's financial results for FY2020. The Company stated that the Company's research and development expenses were $27.85 million, provision for loss contracts related to service was $35.47 million, fuel delivered to customers was $61.82 million for this cost of revenue, gross (loss) profit was ($469.42) million, and operating (loss) income was ($584.20) million.

35

125.     The 2020 Form 10-K also revealed that the Company was still in the process of resolving SEC comments relating to its 2019 Form 10-K and Form 8-K filed with the SEC on November 9, 2020 regarding certain accounting and financial disclosure matters, which could possibly result in changes to the Company existing accounting and financial disclosures.  The Company could not provide assurances that it will not be required to amend the 2019 Form 10-K, the Form 8-K or make any material changes to the accounting or financial disclosures contained in the 2019 Form 10-K, the Form 8-K or similar disclosures made in the Company's other filings, including its 2020 Form 10-K.

## DERIVATIVE AND DEMAND FUTILITY
## ALLEGATIONS FOR THE BOARD OF PLUG POWER

126.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

127.     Plaintiff brings this action derivatively  on behalf of Plug Power to redress injuries already suffered and injuries that continue to be suffered  as a direct and proximate result of the misconduct alleged herein. Plug Power  is named as a nominal Defendant solely in a derivative capacity.

128.     Plaintiff will fairly and adequately represent the interests of the Company in enforcing and prosecuting its rights.

129.     Plaintiff did not make a demand on the Board to take remedial action on behalf of Plug Power against its own members because such a demand  would have been a futile, wasteful and useless act.

**Demand Is Futile Because a Majority of the Board Could Not Have Exercised Disinterested and Independent Business Judgment in Considering the Demand.**

36

130.    At the time of this filing, Plug Power's Board consisted of ten members –
Defendants McNamee, Willis, Helmer, Marsh, Roth, Kenausis, Schneider, Silver, and non-
defendants Kyungyeol Song, Kimberly Harriman,[4] Jean Bua and Kavita Mahtani, who were
recently appointed to the Board in 2022.

131.    The Board exhibited a sustained and systematic failure to fulfill their fiduciary duties
by actively participating or acquiescing in the wrongdoing alleged herein and/or by failing to
implement adequate internal controls and procedures necessary to reasonably assure that the
wrongdoing alleged herein did not occur.  Such failures could not have been an exercise of good
faith business judgment.

132.    The failures of Plug Power's controls and procedures, and the accounting errors
they produced, are red flags that should have alerted the Board  that the Company was releasing
information to the  public that was false  and  misleading,  and  that  there  needed  to  be  much
more  stringent  oversight  of  the  information being released to the public.

133.    Despite these red flags, Plug Power continued to release false  and  misleading
information.  Such failure for the Board to act, when an affirmative  duty to act has materialized,
shows a lack of a good faith effort to be informed and  to exercise judgment.

### Substantial Likelihood of Liability for the Entire Board of Directors

134.    Defendants face a substantial likelihood of liability in this action because of their
admitted failure, as directors and/or officers, to assure that a reliable system of financial controls
was in place and functioning effectively.  The dramatic breakdown and gaps in those controls were
so widespread and systematic that the entire Board faces substantial exposure of liability.

---

[4] Both were appointed to the Board in 2021.

135.    Furthermore, Defendants acted in bad faith by breaching their fiduciary duties in failing to adequately manage and oversee the Company which has, as alleged herein, severely impacted the Company's financial condition and future prospects.

136.    By failing to satisfy their fiduciary duties, Defendants caused irreparable reputational harm to the Company, exposed the Company to millions of dollars of liability in securities class action lawsuits, and have potentially threatened Plug Power's ability to exist in the future. Defendants caused or allowed Plug Power to mislead its shareholders and the general public. Specifically, Defendants failed to disclose errors in the Company's accounting primarily relating to (i) the reported book value  of right of use assets and related finance obligations, (ii) loss accruals for   certain service contracts, (iii) the impairment of certain long-lived assets, and (iv) the classification   of certain expenses previously included in research and development costs.

137.    Defendants Middleton and Marsh then capitalized on the artificially inflated stock price by selling substantial portions of their personally held shares for a massive profit.

138.    Each Director Defendant had a duty to diligently evaluate information provided to the Board by management and to ensure that reasonable systems of reporting existed that all relevant information, including but not limited to information regarding the Company's business, its revenues, classification of expenses and the veracity of the Company's financial disclosures and projections.  Director Defendants either evaluated this information and intentionally or recklessly rubber-stamped Plug Power's misrepresentations, or recklessly failed to ensure the disclosure of information necessary to prevent the statements from being materially false and misleading.

139.    Each of the Director Defendants faces a substantial likelihood of liability in this action because of his/her failure, as a director, to assure that reliable systems of controls were

38

implemented and functioning effectively to prevent the Company from issuing materially misleading statements. Based on the size, scope, and blatancy of the wrongdoing, the Individual Defendants must have known, or were reckless in not knowing, that the statements disseminated during the Relevant Period were materially misleading and/or omitted material information necessary not to make the statements materially misleading. Accordingly, Director Defendants face substantial exposure to liability for their total abrogation of oversight.

140.    Because each of the Director Defendants faces a substantial likelihood of liability for their unexculpated breaches of duty, demand is excused.

**Defendants Marsh and Middleton Face Additional Liability Due to Insider Selling**

141.    Defendants Marsh and Middleton had access to material, non-public information available to them and relied on confidential information when both sold Plug Power stock to take advantage of Plug Power's artificially inflated stock price. Based on this material insider information available to the Individual Defendants they made illegal and improper trades based on material, non-public corporate information.

142.    As alleged in detail herein, on December 24, 2020, Defendant Middleton sold 216,667 shares of his personal held Plug Power stock for $35.1299 per share for proceeds of approximately $7.6 million. This sale took place immediately after the Board of Directors held a meeting advising ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

143.    Defendant Middleton's sale was suspicious in timing. Defendant Middleton's December 24, 2020 sale was made pursuant to a 10b5-1 trading plan that was established just three months earlier in September 2020. The sale was also suspicious because to effectuate the sale,

Defendant Middleton exercised options that were not due to expire until 2028 and 2029 – eight to nine years before their expiration. Defendant Middleton's decision to exercise his options eight to nine years before their expiration further shows that he knew Plug Power's stock price was did not reflect Plug Power's true financial condition.

144.    On January 19, 2021, Defendant Marsh sold 573,268 shares of his personally held Plug Power stock at prices ranging from $62.6504 to $68.3109 per share in a series of seven transactions. Defendant Marsh's sale was purportedly made pursuant to a Rule 10b5-1 trading plan that was instituted while Defendants issued materially false and misleading financial statements. These sales—which reduced Defendant Marsh's holdings by 43% from 1.322 million shares to 748,680 shares—netted Defendant Marsh proceeds of approximately $37.7 million. In order to effectuate the sale of 466,668 shares or 81% of his total shares sold on January 19, 2021, Defendant Marsh exercised options that would not expire until 2027. Defendant Marsh's decision to exercise his options seven years before their expiration further shows that he knew Plug Power's stock price did not reflect Plug Power's true financial condition.

145.    The timing and quantity of the stock sales by Defendant Marsh were also unusual. Defendant Marsh's sale of 573,268 shares of Plug Power stock occurred at or near the Company's 52-week high stock price and reduced his overall holdings in the Company by 43%.

146.    Moreover, similar to Defendant Middleton, Defendant Marsh exercised options that would not expire until 2027 to sell 466,668 shares or 81% of his total shares sold on January 19, 2021. By exercising options approximately 6 years early, especially after Plug Power's stock had increased more than 1500% in the prior 12 months, Defendant Marsh had reason to believe that Plug Power's stock price was worth more at the time than it would be in the future.

147. Defendant Marsh's January 19, 2021 sale was also made pursuant to a 10b5-1 plan, that was in place while the Company issued materially false and misleading financial statements. During 2020, Defendant Marsh made eight other sales pursuant to a 10b5-1 trading plan that was established just months before the sales on March 17, 2020, generating proceeds of approximately $23.7 million. Nearly all of the stock sold by Defendant Marsh pursuant to this trading plan involved options that were not set to expire for four years or more.

148. While failing to impose internal controls including failing to monitor the Company's compliance with accounting policies, the Board allowed senior management to enrich themselves at the expense of outside shareholders.

**Additional Likelihood of Liability for the Audit Committee Members**

149. Defendants Willis, Helmer and Kenausis (served as Chairman during the time when the Company' restated its financials) were, during the period of wrongdoing, members of the Audit Committee of the Company's Board. The Audit Committee is responsible, by its Charter, for preparing, reviewing, and discussing Plug Power's financial statements with management and the independent auditors. The Audit Committee is also responsible for discussing Plug Power's operation of internal controls. Thus, the Audit Committee was responsible for overseeing and directly participating in Plug Power's financial reporting process.

150. However, Defendants Willis, Helmer and Kenausis breached their fiduciary duties of due care, loyalty, and good faith because the Audit Committee failed to disclose material facts to shareholders during the Relevant Period. These Defendants authorized the issuance of Plug Power's SEC filings and financial releases, which contained materially false and misleading statements about the Company's existing business, business potential, and financial future. As members of the Audit Committee, Defendants Willis, Helmer and Kenausis were directly involved

41

in preparing or reviewing such materially false and misleading statements. Thus, Defendants knowingly or recklessly issued materially false and misleading statements that conflicted with facts known by them at that time.

151.    Indeed, the Audit Committee wholly abdicated their responsibilities to the Company and its shareholders by failing to adequately supervise the statements made during the Relevant Period. Because of this abdication, the Company is exposed to significant legal costs as a result of its violations of governing securities laws. Moreover, the Audit Committee's failures took place despite their explicit, particularized duty to ensure the Company's compliance with all federal and state laws.

### Defendants' Interlocking Business Relationships

152.    Defendants Marsh and Kenausis have served simultaneously on the board of GEVO, Inc. since 2015. (220_00002542 and 220_00002433). In addition, Defendant Roth is the founder, chairman, and managing director at FiveT Capital Holding AG, and is a board member of its subsidiary FiveT Capital AG, where Defendant Kenausis has been an investment manager since 2014. (220_00002540).

### A Majority of the Board Is Entrenched

153.    Moreover, several of the Defendants - Helmer, McNamee, and Willis - are entrenched as they have served together at the Company for well over a decade, with Defendants Helmer and Willis serving 17 and 18 years, respectively, and Defendant McNamee serving for almost 24 years.

### The Board Failed to Institute Sufficient Internal Controls and to Assure Truthful Representations

154.    Under applicable law, all of the directors were responsible for overseeing the integrity of Plug Power's accounting and financial statements and its public statements and SEC

filings. The Board members reviewed and approved of the various public communications complained of herein, and had to have been alerted to the misstatement contained therein and omissions therefrom, and had to have been alerted to their materially false and misleading nature.

155. The Company was ultimately forced to admit its internal controls suffered from material deficiencies that rendered them ineffective. The Board's utter failure to establish and monitor internal controls was at the root of the financial misstatements. Material weaknesses were identified in the Company's internal control over financial reporting as of December 31, 2021, 2020, 2019 and 2018.

156. Furthermore, at the time of filing this Complaint, the Company still has not remediated its material weaknesses in its internal controls as the Company's SEC filings admit that Company does not expect to complete its remediation plan until sometime during the year December 31, 2022.

157. These failures of Plug power's controls and procedures, and the accounting errors they produced, are red flags that should have alerted the Board that the Company was releasing information to the public that was false and misleading, and that there need to be much more stringent oversight of the information being released to the public.

158. Despite these red flags, Plug Power continued to release false and misleading information. Such failure for the Board to act, when an affirmative duty to act has materialized, shows a lack of good faith effort to be informed and exercise judgment.

159. Given that a majority, if not all, of the current Board failed to fulfill its most basic fiduciary duties, a majority of the Board is far too directly and specifically involved in the misconduct alleged herein to be able to reasonably or in good faith evaluate a demand to investigate their own misconduct, a pre-suit demand.

## COUNT I
### Against All Individual Defendants for Breach of Fiduciary Duty

160.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth full herein.

161.    The Individual Defendants, by reason of their positions as officers and directors of Plug Power and because of their ability to control the business and corporate affairs of Plug Power, owed Plug Power fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage Plug Power in a fair, just, honest, and equitable manner.

162.    Each of the Individual Defendants violated their fiduciary duties by consciously failing to prevent the Company from engaging in the unlawful acts complained of herein. The Individual Defendants repeatedly encouraged and/or acquiesced in unlawful and unethical behavior throughout the Company's business operations.

163.    The Individual Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity alleged herein. The Individual Defendants either knew, were reckless, or were grossly negligent in not knowing that Plug Power lacked effective disclosure controls and internal controls over financial reporting throughout its business and operations, which had subjected the Company's financial information to numerous errors and misstatements.

164.    The Individual Defendants' misconduct was not due to an honest error in judgment, but rather their bad faith and was done knowingly, willfully, intentionally or recklessly.

165.    Accordingly, the Individual Defendants breached their fiduciary duties to the Company.

166.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Plug Power has sustained significant damages, as alleged herein,

including without limitation, the precipitous decline in Plug Power's value following the public disclosure of the wrongful acts complained of herein.

167.    Plaintiff, on behalf of Plug Power, has no adequate remedy at law.

## COUNT II
## Against Marsh and Middleton for Breach of Fiduciary Duty for Insider Trading

168.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

169.    By reasons of their positions as directors and/or officers of Plug Power, Defendants Marsh and Middleton each owe Plug Power a duty of loyalty and care.

170.    Defendants Marsh and Middleton appropriated Plug Power's confidential and inside information as to the Company's true financial and operating condition including without limitation, non-public information concerning Plug Power's lack of effective disclosure controls and internal controls over financial reporting throughout its business and operations, which had subjected the Company's financial information to numerous errors and misstatements. Such information was used by and motivated Defendants Marsh and Middleton in their decisions to sell or otherwise dispose of Plug Power securities at market prices substantially higher than such prices would have been after all material information regarding Plug Power's financial and operating condition had been disclosed publicly.

171.    Defendants Marsh and Middleton took advantage of such insider information and personally and unjustly profited thereby.

172.    Defendants Marsh's and Middleton's misconduct was not due to an honest error in judgment, but rather their bad faith and was done knowingly, willfully, intentionally and recklessly.

45

173.    Defendants Marsh and Middleton should be required to account for their unjust enrichments as a result of selling or otherwise disposing of Plug Power securities under the circumstances alleged herein and to pay Plug Power the proceeds of such sales together with the earnings upon such proceeds.

174.    Plaintiff, on behalf of Plug Power, have no adequate remedy at law.

## COUNT III

### Against Defendants Marsh and Middleton for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

175.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

176.    Plug Power, and Defendants Marsh and Middleton are named as defendants in the Securities Class Actions, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Marsh's and Middleton's willful and/or reckless violations of their obligations as officers and/or directors of Plug Power.

177.    Defendants Marsh and Middleton, because of their positions of control and authority as CEO and CFO of Plug Power, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Plug Power, including the wrongful acts complained of herein and in the Securities Class Actions.

178.    Accordingly, Defendants Marsh and Middleton are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising

out of violations of the Exchange Act.

179.  As such, Plug Power is entitled to receive all appropriate contribution or indemnification from Defendants Marsh and Middleton.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment on behalf of Plug Power against the Defendants, jointly and severally, as set forth herein as follows:

a)  Declaring that Plaintiff may maintain this action on behalf of Plug Power,  and that Plaintiff is an adequate representative of the Company;

b)  Declaring that the Individual Defendants breached and/or aided and  abetted the breach of their and other members of the Board's fiduciary duties to Plug Power;

c)  Determining and awarding to Plug Power the damages sustained by it as a  result  of the violations set forth above from each of the Individual Defendants, jointly and  severally, together with pre-judgment and post-judgment interest thereof;

d)  Directing Plug Power and the Individual Defendants to take all necessary  actions to reform and improve Plug Power's corporate governance and internal procedures to comply with applicable laws and to protect Plug Power and its shareholders from a repeat of the  damaging events described herein;

e)  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

f)  Granting such other and further relief as the Court may deem just and  proper.

DATED: June 13, 2022

Respectfully Submitted,

**COOCH AND TAYLOR. P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange St., Suite 1120
Wilmington, DE 19801
Phone: 302.984.3800
Facsimile: 302.984.3939
bbennett@coochtaylor.com
*Attorney for Plaintiff*

**Of Counsel:**

William B. Federman
FEDERMAN & SHERWOOD
10205 North Pennsylvania
Oklahoma City, Oklahoma 73120
Phone: 405.235.1560
Facsimile: 405.239.2112

48

## **VERIFICATION**

I, Donna Max declare that I have reviewed the Complaint ("Complaint") prepared on behalf of Plug Power, Inc., and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder and have been a continuous holder of Plug Power, Inc. common stock during the relevant time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

_____6 - 6_____, 2022

Date                                   Donna Max, (Signature of Investor)